**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 22-1654**

───────────────

In re:  GRAND JURY 2021 SUBPOENAS.

------------------------------

UNDER SEAL 1; UNDER SEAL 2,

　　　　　　　Movants – Appellants,

　　　and

UNDER SEAL 3; UNDER SEAL 4; UNDER SEAL 5; UNDER SEAL 6; UNDER
SEAL 7

　　　　　　　Movants,

　　　v.

UNITED STATES OF AMERICA,

　　　　　　　Respondent – Appellee.

───────────────

**No. 22-1655**

───────────────

In re:  GRAND JURY 2021 SUBPOENAS.

------------------------------

UNDER SEAL 1; UNDER SEAL 2,

　　　　　　　Movants – Appellants,

　　　and

UNDER SEAL 3; UNDER SEAL 4; UNDER SEAL 5; UNDER SEAL 6; UNDER SEAL 7,

    Movants,

     v.

UNITED STATES OF AMERICA,

    Respondent – Appellee.

-------------------------

**No. 22-1656**

-------------------------

In re:  GRAND JURY 2021 SUBPOENAS.

-------------------------------

UNDER SEAL 1; UNDER SEAL 2,

    Movants – Appellants,

   and

UNDER SEAL 3; UNDER SEAL 4; UNDER SEAL 5; UNDER SEAL 6; UNDER SEAL 7

    Movants,

     v.

UNITED STATES OF AMERICA,

    Respondent – Appellee.

-------------------------

Appeals from the United States District Court for the District of Maryland, at Baltimore. Stephanie A. Gallagher, District Judge.  (1:21-cv-00556-SAG)

-------------------------

Argued: March 9, 2023                      Decided: November 22, 2023

———————

Before GREGORY and WYNN, Circuit Judges, and FLOYD, Senior Circuit Judge.

———————

Dismissed in part and affirmed in part by published opinion.   Senior Judge Floyd wrote the opinion in which Judge Gregory and Judge Wynn joined.

———————

**ARGUED:**   Arnold Weiner, RIFKIN WEINER LIVINGSTON LLC, Baltimore, Maryland, for Appellants.   Leo Joseph Wise, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

———————

FLOYD, Senior Circuit Judge:

Appellant John Doe is a medical malpractice attorney. While representing a client, Jane Roe, he engaged in settlement negotiations with the University of Maryland Medical System (UMMS). Four additional appellants assisted Doe in his representation of Roe: Law Firm 1; Lawyer 1 (a principal of Law Firm 1); Law Firm 2; and Lawyer 2 (a principal of Law Firm 2).[1]

The negotiations between Doe and UMMS proceeded poorly, as what Doe purported to be a good faith, legal settlement offer was perceived by UMMS as surreptitious extortion. Generally speaking, Doe sought $25 million for Roe. But, among other things, Doe also made any settlement between Roe and UMMS contingent on his personal receipt of an additional $25 million that would effectuate his retention by UMMS as a private consultant of sorts. Also accompanying the settlement offer was Doe's threat of initiating a smear campaign targeting the hospital system if it did not acquiesce to his terms.

A grand jury indicted Doe, charging him with attempted extortion in violation of 18 U.S.C. §§ 1951 and 1952. While the grand jury investigation remained ongoing, a discovery dispute ensued in Doe's active criminal case, culminating in a district court's denial of the government's request for compelled reciprocal discovery. Shortly thereafter—at the government's request—the grand jury issued multiple subpoenas *duces tecum* to the lawyers and firms that assisted in Doe's representation of Roe—and in the

---

[1] For purposes of this opinion, we refer to Law Firm 1 and Lawyer 1 collectively as "Law Firm 1," and Law Firm 2 and Lawyer 2 collectively as "Law Firm 2."

4

formation of the alleged extortion scheme.  Doe and Roe moved to quash the subpoenas, which the district court overseeing the grand jury proceedings denied.  That court then granted in part a subsequent motion filed by the government to compel production.

Doe and Roe now ask this Court to reverse the district court's orders first denying their motions to quash and then compelling production.  Law Firm 2 and Law Firm 1 also ask us to reverse the district court's order compelling production, but only insofar as it pertains to one particular privilege log.  For the reasons that follow, we dismiss the appeal as to Doe for lack of appellate jurisdiction.  We otherwise affirm the district court on all remaining grounds.

I.

Doe brought medical malpractice claims against UMMS for decades.  Multiple of his clients suffered catastrophic injuries from failed organ transplants performed by UMMS surgeons.  Roe is the widow of a man who died following a kidney transplant performed by UMMS.  Following her husband's death, Roe engaged Doe on January 27, 2018, to represent her in a negligence and fraud case against UMMS, alleging that a UMMS surgeon misrepresented the risks associated with the transplant.

Doe commenced settlement negotiations on Roe's behalf.  Generally speaking, Roe sought six things: (1) UMMS's termination of the doctors involved in her husband's treatment; (2) a personal meeting between Roe and Doctor 1, Chief Surgeon at UMMS and head of the Transplant Department; (3) UMMS's assumption of all medical bills related to her husband's treatment; (4) the creation of a training video featuring Roe to be shown to

healthcare professionals that would close with Roe stating, "this is being prepared in memory of [my] late husband, []"; (5) Doe's retention by UMMS as a private consultant to its Department of Transplantation; and (6) $25 million in "punitive damages." Joint Appendix (J.A.) 1988, 2186. At one point, Roe explained that she sought a consultancy agreement between Doe and UMMS so that Doe "would sit in at UMM[S] board meetings, . . . would be compensated for the consultancy[,] and . . . could be aware if doctors that were fired from the UMMC kidney transplant center [were ever] re-hired." J.A. 1988.

Doe communicated frequently with Doctor 1 between February and May of 2018. These communications included multiple meetings for dinner or drinks during which they discussed the facts of Roe's case. In a witness interview, Doctor 1's wife, who attended some of these dinners, effectively stated that Doe adopted a sort of carrot-stick approach to the discussions—offering to have her and Doctor 1 to his Miami home to drive his Rolls Royce, but also insisting that Doctor 1 did what Doe demanded so that they could "be friends" and so that "everything [was] going to be ok." J.A. 2054. Doe and Doctor 1 also exchanged texts during this period, including one message from Doctor 1 stating, "I explained everything [to Employee 1[2]] that we are in jeopardy for fraud and punitive damages. She understands. The ball is in your court." J.A. 2052. According to Appellants, Doctor 1 also informed Doe that UMMS faced other potential claims for failed transplants under similar circumstances. Opening Br. 9 (citing J.A. 1979, 1981–82).

---

[2] Employee 1 was the Senior VP of Claims Litigation at UMMS at this time.

On April 24, 2018, Doe engaged Law Firm 2 to aid in his representation of Roe. Law Firm 2 was to provide services including "research, the writing of a letter(s)[,] and other assistance in connection with the potential resolution of [the] matter involving [Roe] in the[] dispute with [UMMS]." J.A. 2056.

On April 30, after delivering a proposed settlement agreement to Employee 1, Doe and an associate in his employ, Lawyer 3, met with Employee 1, Doctor 2, and Lawyer 4. Doctor 2 was the head of the Maryland Medicine Comprehensive Insurance Program used by UMMS, and Lawyer 4 was outside counsel for UMMS. During the meeting, Doe presented his settlement demands. He emphasized that, given the numerosity of cases against UMMS that he had recently received, "UMMS would have to pay a premium for confidentiality." J.A. 2060. He threatened to "do a great deal of damage to [Doctor 1's] international reputation," and to "put advertisements [about UMMS] on the internet unless a deal was struck." *Id.* Doe elaborated on all of the flaws that he perceived in the transplant process, and stated that Doctor 1 "already admitted that 'they screwed up the underlying case.'" J.A. 2061.

In addition to describing where he would advertise and publish unsavory information about UMMS, Doe played a mock television commercial that he and Roe created, which explained Roe's story and showed images of her husband's necrotic fingertips and amputated leg—both symptoms attributable to the failed transplant. J.A. 2062. Doe effectively threatened to go public with the video—in particular, he threatened to create an "internet bomb" whereby he would fund disparaging advertisements that would display to prospective patients on the UMMS website itself. *Id.* When asked whether

such a plan was legal, Doe and Lawyer 3 did not respond to the question, and instead stated that they would not commence this plan until UMMS "had an opportunity to consider their demand." *Id.* Doe reiterated the $25 million demand for Roe, as well as the demand that he be retained—with an additional $25 million payout to him personally—as a consultant to UMMS in exchange for his confidentiality, and to conflict him out of future cases.[3] The meeting concluded when the UMMS representatives told Doe that they had a hard-stop time that day, but not before they advised Doe to cease contact with Doctor 1.

In June 2018, Doe retained Law Firm 1 to provide a variety of services in connection with the Roe case, including advising on the consultancy portion of the proposed settlement agreement. On June 22, 2018, Doe and Lawyer 3 again met with Employee 1, Lawyer 4, and Employee 1's associate Employee 2. Doe presented a more detailed consultancy proposal than he had previously. In Employee 2's contemporaneously recorded notes, she wrote that Doe sought to "become consultant for [the] hospital," and "defend cases over a [period] of time." J.A. 2159. Per Employee 2's notes, Doe sought a $25 million payment for his consulting services, though he stated that he "could make [it] $100 [million]." J.A. 2162. Doe reiterated many of the same advertising and reputational threats from the prior meeting. He explained that his threats were not threats because "I don't want to do it, so don't make me do it[.] [T]hat means it's not a threat [because] I don't want to do it." J.A.

---

[3] Doe seemed to request a consultancy arrangement "like the Murphy firm." J.A. 2062. At that time, UMMS and the "Murphy firm" had a retainer agreement by which the Murphy firm provided advice and occasional defense of malpractice cases to UMMS. Opening Br. 10.

2164.  He also explained that without the consultancy agreement for him, there would be no settlement of Roe's case against UMMS.

On August 13, 2018, UMMS contacted the U.S. Attorney's Office, complaining that it was the victim of attempted extortion.  The FBI began scheduling and surreptitiously recording meetings and telephone conversations between Doe and UMMS representatives.  During an August 23, 2018, meeting, UMMS representatives asked Doe if his proposed consultancy amounted to extortion.  He responded, in part, "Uh, it's not extortion.  Because the – the – the – the – I'm not using any facts that aren't – or, excuse me, I'm gonna talk like . . . uh – uh, make, the truth and not the truth." J.A. 462.  He then referenced his hiring of Law Firm 1, explaining that the purpose of the firm's involvement was to ensure that the agreement was legal.  Notably, UMMS representatives voiced concern that even if the proposed consultancy was facially legal, it would represent a contrived fabrication, or a strawman of sorts, to, in a post-hoc manner, legitimize what was otherwise full-blown extortion.  Doe relied heavily on Law Firm 1's presence as an ethical consultant to rebut extortion-related comments.  He eventually stated "if it can't be done then it can't be done.  That's – that's just the bottom line." J.A. 582.  Doctor 2 then asked what would happen to Roe's case if the consultancy did not manifest.  Doe responded, in that context, "I'm going forward." *Id.*  This and other comments about the all-or-nothing nature of the settlement demands reified Doe's position that he would not settle Roe's claims against the hospital without his consultancy agreement.

On October 22, 2018, Doctor 2 and Employee 1 filed a complaint against Doe with the Attorney Grievance Commission of Maryland (AGC).  The complaint included

9

allegations of attempted extortion.  On April 20, 2020, the AGC directed Bar Counsel to petition for disciplinary or remedial action in the Court of Appeals of Maryland.  Bar Counsel filed the petition on July 13, 2020, and that proceeding is currently stayed.

According to Doe, around August 2019, the government declined to prosecute the extortion allegations because of Law Firm 1's participation as a purported ethics advisor in the formulation of the consultancy agreement, and because of perceived difficulties in establishing criminal intent.[4]  Opening Br. 15.  But then, on October 5, 2020, the government indicted Doe.  The indictment charged Doe with attempted extortion in violation of 18 U.S.C. §§ 1951 and 1952.

The criminal proceeding borne of that indictment is currently pending in the District of Maryland.  Meanwhile, the separate grand jury investigation—the subject of this appeal—remains ongoing in the same district.

A discovery dispute commenced in the criminal proceeding.  In essence, the government proposed a discovery schedule, offering dates by which each side would produce its respective discovery and deadlines for motion practice.  Doe declined to participate in reciprocal discovery, contending that he had no obligation to disclose unless he first requested disclosure from the government, which he did not. *See* Fed. R. Evid. 16(b)(1)(A) ("If a defendant requests disclosure . . . and the government complies, then the defendant must permit the government, upon request, to inspect and to copy" discoverable materials "if . . . the item[s are] within the defendant's possession, custody, or control[]

---

[4] Anecdotally, around the same time, Doe settled Roe's case with UMMS.

and . . . the defendant intends to use [them] in [his] case-in-chief at trial."). In other words, Doe maintained that as long as he did not request discovery from the government, he needed not respond to any of the government's discovery requests.

The government was incensed by Doe's position, stating at a hearing on the issue: "To say I don't want your documents, I want to be surprised so that I can surprise you, is just bonkers"—also noting that "we can't have a trial by surprise" for practical reasons involving each side's ability to prepare pre-trial motions, including motions *in limine*, and object in real time at trial. J.A. 175. The government further stated, "In 16 years as a prosecutor I have never seen a defense attorney say I don't want your discovery so that I can surprise you with mine, and I think that is just not acceptable under the law or for practical reasons." *Id.*

In an oral decision issued on December 21, 2020, the district court declined to require Doe to engage in reciprocal discovery per the government's request. It reasoned that the plain language of Rule 16 mandates a defendant's production only if the defendant first requests production from the government. The district court squared the Rule's framing with burdens of proof at trial. It reasoned that it could not "requir[e] the [d]efendant to provide information to the [g]overnment that the [g]overnment would subsequently be able to use in its case against the [d]efendant," given that the government bears the ultimate burden of proving guilt beyond a reasonable doubt, and a defendant need not present any of his own evidence to prevail over the government's case. J.A. 178. However, the court also noted that, certainly, the trial could be "extraordinarily cumbersome" given Doe's position, and the court would likely be less sympathetic

11

regarding concerns of surprise raised by Doe than those raised by the government.  J.A. 177–78.  The court emphasized that Doe should understand "the very thin waters that [he is] treading into."  J.A. 178.

According to Doe, "[i]mmediately after [the district court] rejected the [g]overnment's discovery requests, the prosecutors resorted to the grand jury [in No. 21-cv-556] for the information and material they deemed necessary for the case against [Doe] [in Crim. No. GLR-20-0337]."  Opening Br. 23.  On February 18, 2021, the grand jury issued subpoenas *duces tecum* to Law Firm 2, Law Firm 1, and Lawyer 3—approximately two months after the district court's oral decision regarding the discovery dispute in Doe's criminal proceeding.  On March 3, 2021, Doe moved to intervene and to quash the subpoenas.  He argued that the government was "abusing the grand jury process by using the grand jury subpoena power for the dominant purpose of preparing for motions and trial, and for gathering evidence, on an already pending indictment."  J.A. 21.  In April 2021, Roe also moved to intervene and to quash.  On June 3, 2021, the district court overseeing the grand jury investigation in No. 21-cv-556 granted the motions to intervene but denied the motions to quash.  The court further directed Doe and the subpoena recipients to respond to the subpoenas and provide privilege logs for all potentially privileged information.

Doe responded, but the government contended that his response lacked any meaningful production.  According to the government, he claimed that nearly every substantive document requested was subject to some protection or privilege.  He included a privilege log totaling more than 265 pages (the "Privilege Log 1").  Law Firm 1 submitted

12

an 8-page log (the "Firm 1 Privilege Log"). Law Firm 2 submitted a log totaling 4 pages (the "Firm 2 Privilege Log"). Wholly dissatisfied, the government moved to compel. Appellants opposed the motion, arguing that logged documents were protected by either attorney-client privilege or by work-product privilege.

On May 31, 2022, the district court granted in part and denied in part the government's motion. As to the Privilege Log 1, the court held that communications between Roe and Doe regarding the proposed consultancy were discoverable because Roe "waived her right to assert attorney-client privilege" by disclosing substantive communications to Bar Counsel during an interview conducted in the course of the Maryland Bar's investigation into Doe. J.A. 2316. The court likewise found that the crime-fraud exception applied to any claims of tangible or opinion work-product privilege that Doe and/or Roe might assert as to documents concerning the consultancy.

Regarding the Firm 1 Privilege Log, the district court first found that "any attorney-client relationship existed between [Law Firm 1] and [Doe], not between [Law Firm 1] and [Roe]." J.A. 2327. The court continued that the crime-fraud exception applied to any attorney-client privilege that Doe may claim. It likewise found that many documents contained in that log failed to qualify as work product because the consultancy itself sought to evade litigation—it was not sought in anticipation of litigation. Notably, though, the district court also recognized a subgroup of documents related to the consultancy that were prepared in anticipation of litigation, thus qualifying them for work-product privilege. Another subgroup of documents in the Firm 1 Privilege Log related to Law Firm 1's representation of Doe in the Bar Counsel investigation, and were also protected.

13

Regarding the Firm 2 Privilege Log, the court found that some documents constituted opinion work product because Law Firm 2 lawyers prepared them in anticipation of litigation in the Roe matter. But other documents were discoverable because they provided legal advice to Doe related to execution of the consultancy.

Notably, prior to the court's ruling, it conducted *in camera* review of both the Firm 1 and Firm 2 Privilege Logs, but it did not conduct *in camera* review of Privilege Log 1, despite ordering the production of most documents listed in that log. Opening Br. 33. On June 17, 2022, the district court issued a clarifying order because it realized that some documents that it ordered produced in the Privilege Log 1 also existed in the Firm 1 and Firm 2 Privilege Logs, and in the latter two, the court ordered those documents protected. Thus, the court explained that "if [Lawyer 3] has a copy of a document that this [c]ourt found was properly withheld by [Law Firm 1] or [Law Firm 2], he should not produce it, and this [c]ourt's prior rulings should not be construed to require otherwise." J.A. 2354. Appellants also argued that some documents ordered to be produced from the Privilege Log 1 are so substantially similar to documents ordered protected in the Firm 1 and Firm 2 Privilege Logs that those, too, should be deemed excluded from the court's order to compel. But the court did not address this additional argument in its clarifying order.[5]

---

[5] Appellants do not seek our review of the district court's alleged failure to clarify this issue. Regardless, when the district court extended its clarificatory protections to Privilege Log 1, it reasoned that "[i]t is the content of those [protected] documents [within the Firm 1 and Firm 2 Privilege Logs] that [the court] found warranted protection, irrespective of whether [Lawyer 3] also possesses a copy." J.A. 2354. This clarification seems to convey the district court's appropriate recognition that documents need not be perfectly duplicative across logs to warrant protection, so long as material content is substantially the same.

This appeal followed, framed by Appellants as arising under 28 U.S.C. § 1291, which provides this Court's jurisdiction to review "all final decisions of the district courts of the United States."

## II.

We begin by laying out the parties' positions.  Doe and Roe appeal the district court's denial of their motions to quash and its order compelling production.  Law Firm 2 and Law Firm 1 only appeal the district court's order compelling production insofar as it ordered production of documents held by Lawyer 3 over which Law Firm 2 and Law Firm 1 claimed work-product privileges.  Neither Law Firm 2 nor Law Firm 1 appeal the district court's order compelling them to produce documents on their own privilege logs.[6]

With respect to the motion to quash, Doe and Roe argue that the court abused its discretion by refusing to conduct *in camera* review of documents that they contend would have proven that the government's dominant purpose in seeking the grand jury subpoenas was trial preparation in Doe's criminal case—instead, it found that they failed to meet their burden of proving an abusive dominant purpose.  They also argue that the court abused its discretion by denying the motions to quash while ignoring facts and surrounding

---

[6] Notably, the parties seem to agree that not every Appellant challenges the same components of the district court's orders.  But the consolidated briefing does little to delineate specifically which Appellant(s) raises which arguments, and to which portions of the district court's ruling(s) those arguments apply.  The government, too, generally attributes Appellants' collective arguments to Doe for purposes of its briefing.  Thus, for our purposes, we too shall simply refer to Appellants collectively when to do otherwise would be impossible or impractical based on their own framing of this appeal.

circumstances that cast doubt on the legitimacy of the subpoenas—including the fact that the subpoenas came on the heels of a contentious discovery dispute in Doe's criminal case.

Appellants allege several errors regarding the motion to compel. First, they argue that the court erred in rendering certain factual findings and then in effectuating this Court's treatment of "dual-purpose" documents announced in *National Union Fire Insurance Co. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980 (4th Cir. 1992). Second, they argue that the court erred by finding that the crime-fraud exception forfeited work-product protections held by Roe—an innocent client—pursuant to this Court's precedent in *In re Doe*, 662 F.2d 1073 (4th Cir. 1981), and *Hanson v. United States Agency for International Development*, 372 F.3d 286 (4th Cir. 2004). Third, they argue that the court erred in finding that Roe waived her attorney-client privilege when she cooperated with Bar Counsel in Doe's ethics investigation under Maryland Rule 19-707(b)(1). Fourth, they argue that the court abused its discretion in finding a prima facie showing of the crime-fraud exception based only on the indictment of Doe, and without regard to the government's alleged pre-indictment concession that criminal intent may be difficult to prove in Doe's case. Fifth, they argue generally that the court erred by ordering the production of documents protected by attorney-client and work-product privileges.

The government first responds that this Court lacks appellate jurisdiction over Doe at this juncture, so he should be dismissed from the appeal. It further argues that Roe is not aggrieved by the grand jury process or the portion of the order compelling production that applied only to Doe, so she may not challenge them in his absence. Finally, the government contends that the district court did not abuse its discretion or err in any of its

16

remaining legal or factual analyses, and thus should be wholly affirmed.  We address the parties' positions in turn.

A.

We first address this Court's jurisdiction to consider Doe's challenges.  The government argues that we lack appellate jurisdiction over Doe because, as to him alone, the district court's orders denying his motion to quash and granting the government's motion to compel neither are "final" for purposes of appellate review nor qualify for an exception to the final-judgment rule.  Instead, the government contends that Doe should vindicate his challenges on direct appeal at the conclusion of his criminal case, if necessary.  Despite the Supreme Court's narrowing of interlocutory appellate review in the context of the collateral-order doctrine, Doe responds that this Court retains jurisdiction over his appeal under the *Perlman* doctrine.

"Our first obligation is to ascertain whether we possess jurisdiction of an appeal, an issue we assess *de novo*."  *Dickens v. Aetna Life Ins. Co.*, 677 F.3d 228, 231 (4th Cir. 2012) (simplified).  Appellate courts generally only review "final decisions of the district courts."  28 U.S.C. § 1291; *see also In re Naranjo*, 768 F.3d 332, 342 (4th Cir. 2014).  Final decisions are "those that end [a] litigation on the merits and leave nothing for the court to do but execute the judgment."  *McCook Metals LLC v. Alcoa, Inc.*, 249 F.3d 330, 334 (4th Cir. 2001) (simplified).  "This final-judgment rule aims to combine all reviewable stages from a proceeding into one appeal and thus to prevent the harassment and cost of interlocutory appeals."  *United States v. Myers*, 593 F.3d 338, 344 (4th Cir. 2010)

17

(simplified). The rule also "preserv[es] the primacy of the district court as the arbiter of proceedings before it." *GO Comput., Inc. v. Microsoft Corp.*, 508 F.3d 170, 176 (4th Cir. 2007) (quotation omitted).

In the past, this Court has generally held that "[o]rders enforcing subpoenas issued in connection with civil and criminal actions, or with grand jury proceedings, are normally not considered final." *United States v. Search of 235 S. Queen St., Martinsburg, W. Va.*, 319 F. App'x 197, 200 (4th Cir. 2008) (simplified); *see also In re Subpoena Duces Tecum*, 228 F.3d 341, 345 (4th Cir. 2000). But an exception to this general rule exists in the form of the collateral-order doctrine. Under this doctrine, such non-final orders may be immediately reviewed when they: "(1) conclusively determine [a] disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) [are] effectively unreviewable on appeal from a final judgment." *Cobra Nat. Res., LLC v. Fed. Mine Safety & Health Rev. Comm'n*, 742 F.3d 82, 86 (4th Cir. 2014) (simplified).

The Supreme Court has cautioned that the collateral-order doctrine must "never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994) (citations omitted). As particularly relevant here, that Court expressly narrowed the availability of collateral-order review in *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009). There, the Court declined to exercise collateral-order jurisdiction in a putative appeal involving a pretrial discovery order that rejected a claim of attorney-client privilege. *See Mohawk*, 558 U.S. at 108–09, 114 (holding that, although a privilege interest is certainly important, it can effectively be reviewed on direct appeal

18

without resorting to the collateral-order doctrine to bypass the final-judgment rule).

A second exception, the *Perlman* doctrine, also exists. *See Perlman v. United States*, 247 U.S. 7 (1918). Generally speaking, a "long-recognized option" for a party to effectively receive immediate, interlocutory treatment of a disclosure order is to defy the order, receive a criminal contempt citation, and then seek review of that contempt ruling. *Mohawk*, 558 U.S. at 111. But under the *Perlman* doctrine, "a discovery order directed at a disinterested third party is treated as an immediately appealable final order because the third party presumably lacks a sufficient stake in the proceeding to risk contempt by refusing compliance." *Holt-Orsted v. City of Dickson*, 641 F.3d 230, 237 (6th Cir. 2011) (simplified); *see also Perlman*, 247 U.S. at 13 (recognizing the importance of the immediate appealability of disclosure orders directed at disinterested third parties because, under such circumstances, a party claiming a privilege is otherwise "powerless to avert the mischief of the order").

In *Perlman*, the Supreme Court allowed immediate review of an order directing a third party to produce documents that belonged to the appellant. 247 U.S. at 12–13. The appellant claimed that these documents were immune from production, but the third party that possessed them, the clerk of court, had no interest in defying a disclosure order. *Id.* According to the Court, to have denied immediate review would have left the appellant without recourse because the clerk could not have been expected to risk a contempt citation to secure for the appellant an opportunity for immediate judicial review. *Id.* Conversely, if the documents had been in the appellant's control, he could have secured a contempt ruling against himself for failure to produce, thereby acquiring a final order subject to

immediate review.  Thus, immediate appealability under *Perlman* depends on a third party's control of the documents subject to a disclosure order.

Importantly, though, the fate of the *Perlman* doctrine in the wake of *Mohawk*'s express narrowing of the collateral-order doctrine is up for debate.  *Compare In re Grand Jury Investigation*, 966 F.3d 991, 997 (9th Cir. 2020) ("We recognize that *Perlman* was decided one hundred years ago.  But the Supreme Court has given us no reason to suspect that it is no longer good law."), *and In re Grand Jury*, 705 F.3d 133, 145–46 (3d Cir. 2012) ("[W]e decline to hold that the Supreme Court narrowed the *Perlman* doctrine . . . *sub silentio*." (citations omitted)), *with Naranjo*, 768 F.3d at 343 n.14 ("*Perlman* may no longer provide a viable rule in light of [*Mohawk*]. . . . *Mohawk* might be read to say that interlocutory appeals . . . should not be permitted when the privilege-holder has other means to protect his privilege rights." (simplified)), *Wilson v. O'Brien*, 621 F.3d 641, 643 (7th Cir. 2010) (ultimately declining to reach the issue, but explaining that *Mohawk* "calls *Perlman* . . . into question, because, whether the [discovery] order is directed against a litigant or a third party, an appeal from the final decision will allow review of the district court's ruling.  Only when . . . a non-litigant [asserts the privilege] will an appeal from the final decision be inadequate"), *and Holt-Orsted*, 641 F.3d at 238–40 (applying *Mohawk* to limit the application of the *Perlman* doctrine to situations in which non-litigants raise privilege issues, given that post-judgment appeals sufficiently protect any privilege concerns raised by litigants).

Here, following the Supreme Court's decision in *Mohawk*, there remains no doubt that this Court lacks jurisdiction under the collateral-order doctrine.  As the Supreme Court

expressly held, allegedly compromised privilege interests can be reviewed perfectly well on post-judgment appeal without resorting to the subjugation of the final-judgment rule. Any allegation of grand jury abuse is likewise effectively reviewed on direct appeal, and Doe need not resort to the collateral-order doctrine to vindicate his position in that regard.

The applicability of the *Perlman* doctrine is a closer question. Ultimately, we conclude that the doctrine likewise fails to justify this Court's exercise of jurisdiction over Doe's arguments at this stage.[7] Insofar as Doe himself seeks immediate review, *Perlman*'s applicability is irreconcilable with the Supreme Court's extreme narrowing of interlocutory appeals via the collateral-order doctrine in *Mohawk*. This is because, even in the context of a disclosure order directed at a third party—of which *Perlman* would traditionally permit immediate review—an aggrieved litigant can still simply press the alleged privilege on direct appeal in a manner no different than that required by the Supreme Court in the context of the collateral-order doctrine.

The Supreme Court mandates that 28 U.S.C. § 1291, under which this appeal arises, be given "a practical rather than a technical construction." *Mohawk*, 558 U.S. at 106

---

[7] True, this Court recognized the possible applicability of *Perlman* to cases similar to the instant appeal in *United States v. Myers*. *See* 593 F.3d 338, 345 n.11 (4th Cir. 2010) (noting in dicta that an appellant "might have" appealed under *Perlman* because an order compelling production directed a third party to provide items to the government); *see also In re Grand Jury 16-3817 (16-4)*, 740 F. App'x 243, 245 (4th Cir. 2018) (non-binding opinion finding jurisdiction under *Perlman*, neither contemplating nor reaching the doctrine's viability post-*Mohawk*). But the precise issue of *Mohawk*'s impact on the *Perlman* doctrine was not before the *Myers* panel, nor did the panel consider the issue of its own volition. We decline to hold such dicta binding, particularly when this Court subsequently and explicitly questioned the doctrine's continued viability in *Naranjo*. 768 F.3d at 343 n.14.

(simplified). *Mohawk* recognized that "[p]ermitting piecemeal, prejudgment appeals . . . undermines efficient judicial administration and encroaches upon the prerogatives of district court judges, who play a special role in managing ongoing litigation." *Id.* (simplified). Consequently, "[t]he justification for immediate appeal must . . . be sufficiently strong to overcome the usual benefits of deferring appeal until litigation concludes." *Id.* at 107. To that end, the Supreme Court concluded that even a justification as core to our adversarial system as a privilege interest was not so imperiled by deferral of review to the post-judgment stage that interlocutory review was warranted. *See id.* at 108–09. Instead, the Court reasoned that post-judgment appeals "generally suffice to protect the rights of litigants and ensure the vitality of the attorney-client privilege." *Id.* at 109.

With this framing in mind, and for our purposes here, any distinction between the collateral-order doctrine and the *Perlman* doctrine is one without a difference—the Supreme Court's reasoning in *Mohawk* is equally applicable in both contexts. Rather, Doe seeks to vindicate a privilege interest that *Mohawk* expressly recognized should be addressed on post-judgment review. Whether the compelled disclosure to which he objects ultimately comes from him (a collateral-order context) or from a third party (a *Perlman* context) is entirely inconsequential insofar as his access to post-judgment review is unchanged either way. As such, we conclude that the Supreme Court's narrowing of the collateral-order exception to the final-judgment rule in *Mohawk* applies equally to the *Perlman* doctrine—thereby excluding immediate litigant-sought review.

Of course, we remain cognizant of the fact that, where a privilege interest is concerned, once the cat is out of the bag, there is effectively no perfect remediation. "But

22

deferring review [of privilege interests] until final judgment does not meaningfully reduce the *ex ante* incentives for full and frank consultations between clients and counsel." *Id.* at 109. Furthermore, other tools likewise guard against particularly injurious outcomes. For example, here, the district court overseeing the grand jury investigation granted a stay of its order compelling disclosure using language consistent with certification of an interlocutory appeal under 28 U.S.C. § 1292(b). J.A. 2366–67. Section 1292(b) provides that:

> [w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

Specifically, the district court explained that:

> [t]he issues decided in this Court's opinion raised difficult legal issues, and at times involved fact-intensive analysis, about which reasonable minds could differ. The Movants' arguments, therefore—on both the appealability of this Court's decision and the merits of it—are certainly colorable and worthy of consideration by the Fourth Circuit. And the potential harm of unwarranted disclosure of protected information weighs strongly in favor of maintaining the status quo in the meantime. Thus, while this Court does not believe the Movants are likely to succeed, their arguments are legitimate enough, and the stakes are high enough, that this Court believes the Movants should be afforded a meaningful opportunity to seek appellate review.

J.A. 2366.

23

As such, without deciding the issue, it seems at least plausible that this Court could have comfortably exercised jurisdiction over Doe's arguments under 28 U.S.C. § 1292(b). But Appellants appealed pursuant to § 1291—or, rather, pursuant to an exception to the statute—not § 1292. The Supreme Court in *Mohawk* expressly recognized that litigants can—and should—pursue interlocutory appeals concerning privilege issues under § 1292(b). *Mohawk*, 558 U.S. at 110–11 ("[W]ere attorneys and clients to reflect upon their appellate options, they would find that litigants confronted with particularly injurious or novel privilege rulings have several potential avenues of appellate review apart from collateral order appeal. First, . . . interlocutory appeal pursuant to [§ 1292(b)]. . . . Second, in extraordinary circumstances[,] . . . a writ of mandamus.").

Although we conclude that Doe prematurely sought our review under *Perlman*'s exception to 28 U.S.C. § 1291, we do not likewise foreclose review of the arguments presented by the remaining appellants. As the Sixth and Seventh Circuits discerningly note, *Mohawk*'s narrowing of the *Perlman* doctrine logically excludes, at this juncture, only immediate review sought by participating litigants. *See Wilson*, 621 F.3d at 643; *Holt-Orsted*, 641 F.3d at 238–40. This exclusion only of litigant-sought review aligns with *Mohawk*'s chief purpose of mitigating excessive circumvention of the final-judgment rule, particularly when perfectly adequate post-judgment appeal opportunities exist. 558 U.S. at 103 ("[Post-judgment] appeals, together with other review mechanisms, suffice to protect the rights of litigants and preserve the vitality of the attorney-client privilege" without resort to exceptions to the final-judgment rule.) But such opportunities are fewer or entirely unavailable with respect to non-litigant third parties—i.e., a non-litigant cannot

24

pursue direct, post-judgment appeal. Thus, the *Perlman* doctrine remains crucial to the

vindication of third-party rights. Accordingly, with Doe dismissed, we retain jurisdiction

over the remaining non-litigant appellants.[8, 9]

## B.

We next consider the implications of Doe's absence from this appeal on the

remaining challenges by Roe. The government argues that Roe, Doe's client in the

---

[8] The government concedes to our jurisdiction over these remaining non-litigant third parties pursuant to the *Perlman* doctrine. *See, e.g.*, Resp. Br. 2. Notably, courts have clarified that a third party's mere possession of subpoenaed materials is not enough to warrant treatment under *Perlman*. Instead, "the subpoenaed third party's lack of interest in protecting the confidentiality of the subpoenaed documents is the touchstone of the *Perlman* inquiry." *In re Grand Jury Subpoena*, 56 F.4th 395, 399 (5th Cir. 2022); *see also Grand Jury 16-3817 (16-4)*, 740 F. App'x at 245 (holding that the *Perlman* doctrine applies only when a disclosure order is directed at "a disinterested third party"); *Naranjo*, 768 F.3d at 346 (holding that the exception only applies "when there exists a real possibility the third party will not risk being found in contempt and will turn over the subpoenaed documents" (simplified)). With that in mind, we note our skepticism that each non-litigant Appellant here is truly "disinterested" for purposes of *Perlman*'s applicability—particularly when a grand jury investigation pends, and given the professional duties that may be owed between these remaining entities (and Doe). But we decline to delve into such uncontested matters.

[9] The government also argues that, in Appellants' jurisdictional statement, they seek review only of the district court's May 31, 2022, order compelling production, and not review of prior orders denying Doe and Roe's motions to quash and mandating preparation of privilege logs. Thus, according to the government, we may only review the order compelling disclosure dated May 31, 2022. Although we need not decide this issue with respect to Doe based on the foregoing jurisdictional analysis, we proceed to review all relevant orders with respect to Roe pursuant to Federal Rule of Appellate Procedure 3. Fed. R. App. P. 3(c)(4) ("The notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order. It is not necessary to designate those orders in the notice of appeal."); *see also id.* Advisory Committee Notes to 2021 Amendments ("The general merger rule can be stated simply: an appeal from a final judgment permits review of all rulings that led up to the judgment."). Although Appellants expressly appealed only the May 31 order, it cannot reasonably be said that the prior orders are not inextricably intertwined with that disclosure order.

underlying malpractice case, is not aggrieved by any governmental abuse of the grand jury process or by the disclosure of communications between Doe and the lawyers representing him in his Maryland ethics hearings, so she lacks standing to challenge those issues in his absence from this appeal. Roe responds that the government raises this argument for the first time on appeal, and effectively challenges her very intervention—an issue not before this Court. She likewise seems to argue that some of her privileged material may be implicated by the grand jury investigation and the ethics proceedings, so she is sufficiently aggrieved to retain the right to raise these arguments in Doe's absence.

"It is typically only parties who are bound by a judgment and sufficiently aggrieved by it who possess constitutional and prudential standing to seek appellate review of the district court's decision." *Doe v. Pub. Citizen*, 749 F.3d 246, 257 (4th Cir. 2014) (citation omitted); *see also Newberry v. Davison Chem. Co.*, 65 F.2d 724, 729 (4th Cir. 1993) ("[I]t is only a party affected by an order or decree who may appeal from it." (citations omitted)). But we "have shown greater flexibility with respect to nonparty appellants." *United States v. Under Seal*, 853 F.3d 706, 721 (4th Cir. 2017). "[A] nonparty may appeal a district court's order or judgment when the appellant (1) possessed an interest in the cause litigated before the district court and (2) participated in the proceedings actively enough to make [her] privy to the record." *Id.* (simplified).

Here, the government's argument that "[Roe] has no more than a general interest, shared by other members of society, in 'wishing to curb abuses of the grand jury process'" is entirely unpersuasive. Resp. Br. 34 (quoting *In re Grand Jury Subpoenas Duces Tecum, Aug 1986*, 658 F. Supp. 474, 483 (D. Md. 1987)). Roe's interest is instead highly specific

given that any abuse of the grand jury process almost assuredly implicates at least some privileged materials in which she arguably retains a confidentiality interest. Perhaps it could be said that Doe would be *most* aggrieved by any abuse, given that he retains similar arguable privilege interests, while also being subject to criminal proceedings that any abuse would surely embroil. But we decline to allow our aggrievement analysis to devolve in such a way that it recognizes only the rights of a single party to whom the risk of harm is greatest—and not the rights of others with interests just as concrete, if slightly less numerous. Furthermore, Roe actively participated in the proceedings below in hopes of vindicating her alleged interests. Thus, we decline to dismiss Roe's challenges insofar as they relate to her privilege interests.[10, 11]

## C.

Accordingly, we turn to the allegation of grand jury abuse as presented by Roe. Roe argues that the district court abused its discretion by refusing the request to conduct additional *in camera* review of documents to discern the dominant purpose of the government's subpoenas. She further argues that this abuse of discretion continued when the court denied her motion to quash on the ground that she and Doe failed to meet their burden under the dominant-purpose test. Finally, she contends that the facts below were

---

[10] Our holding is not to be understood as permitting Roe—in Doe's absence—to assert privileges that exist solely between Doe and other parties, when those privileges are wholly untethered from the representation of Roe and materials in which she herself retains an interest.

[11] We do not today opine on what, if any, preclusive effect our adjudication of the remaining Appellants' arguments may have on a prospective appeal by Doe.

generally sufficient to prove governmental abuse of the grand jury process. The government responds that the district court committed no clear error in concluding that the government lacked a dominant purpose of abuse when it sought the subpoenas. The government further responds that the district court did not abuse its discretion in denying the motion to quash, particularly when Roe and Doe, relying on little more than speculation and shaky inferences, failed to meet their burden to rebut the presumption of regularity that attaches to grand jury proceedings.

This Court has reviewed allegations of grand jury abuse under both abuse-of-discretion and clear-error standards. *Compare In re Grand Jury Subpoena*, 175 F.3d 332, 337 (4th Cir. 1999) (holding that "we review the district court's finding regarding [the government's] purpose in seeking the [grand jury] subpoena for clear error"), *and United States v. Moss*, 756 F.2d 329, 332 (4th Cir. 1985) ("Like questions involving intent, the finding of a district court regarding the sole or dominant purpose of the government in bringing additional witnesses before the grand jury for post-indictment questioning may be reversed only if it is clearly erroneous." (simplified)), *with United States v. Alvarado*, 840 F.3d 184, 188–89 (4th Cir. 2016) (applying abuse-of-discretion standard to allegations of grand jury abuse). To clarify, clear error applies to the district court's factual determination of what a subpoena's dominant purpose is, and abuse of discretion applies to the court's derivative decision concerning how best to proceed with discovery given that initial factual determination.

The clear-error standard "requires a reviewing court to ask whether on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed."

*United States v. Span*, 789 F.3d 320, 325 (4th Cir. 2015) (simplified). We "will not reverse a lower court's finding of fact simply because we would have decided the case differently, but we may find clear error where the factual determinations are not supported by substantial evidence." *Id.* (simplified). Meanwhile, regarding the abuse-of-discretion standard, district courts enjoy "considerable discretion in overseeing discovery," and "we will disturb a district court's discovery rulings only if we find an abuse of discretion." *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 188 (4th Cir. 2019) (simplified). "An abuse of discretion occurs [when] a decision is guided by erroneous legal principles . . . or rests upon a clearly erroneous factual finding." *United States v. Chikvashili*, 859 F.3d 285, 292 (4th Cir. 2017) (simplified). In applying the abuse-of-discretion standard, we review the district court's factual conclusions for clear error, as described above, and its legal conclusions *de novo. In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017).

This Court "adheres to the universal rule that prosecutors cannot use grand jury proceedings for the sole or dominant purpose of preparing for trial on an already pending indictment." *Alvarado*, 840 F.3d at 189 (simplified). Rather, "once a criminal defendant has been indicted, the government is barred from employing the grand jury for the sole or dominant purpose of developing additional evidence against the defendant." *Id.* (simplified). If a district court concludes that an improper sole or dominant purpose of a grand jury investigation exists, it has discretion to take appropriate remedial action. *Id.* (simplified).

However, we decline to diminish the importance of protecting the grand jury's investigative function, on which district courts should not infringe absent "compelling

evidence of grand jury abuse." *Id.* (citation omitted).  Grand juries lack clairvoyance, and thus "must be allowed to investigate freely individuals suspected of involvement in crimes for which indictments have already been issued." *Moss*, 756 F.2d at 332.  The nature of grand jury investigations is such that they likely uncover evidence "pertinent to both already-indicted charges and new charges," and the grand jury need not disregard the former when investigating the latter. *Alvarado*, 840 F.3d at 190.  Thus, defendants alleging abuse "bear the burden of rebutting the presumption of regularity attached to a grand jury's proceeding." *Id.* at 189 (simplified).

Here, the district court did not clearly err by concluding that abusive discovery was not the government's sole or dominant purpose when it sought the disputed subpoenas. The district court clearly considered the record as a whole and rendered a well-reasoned conclusion under the dominant-purpose test.  To begin, Roe's theory of abuse revolves largely around the timing of the subpoenas' issuance.  She argues that these came directly on the heels of the district court in the criminal case declining to force reciprocal discovery—as sought by the government.  But the timing of the subpoenas is of little moment here, particularly given that the productions sought by the subpoenas are wholly different from the disclosures sought by the government in the criminal proceeding. Rather, as the district court correctly recognized, the government largely sought reciprocal *expert* disclosures in the criminal case, not previously unacquired document production.[12]

---

[12] Even if subpoena timing was suspect, the government's *ex parte* letter—discussed below—evinces a significant and legitimate purpose behind the subpoenas' issuance. Thus, assuming that the grand jury investigation does indeed provide the government with
(Continued)

Thus, any additional disclosures acquired via grand jury subpoenas fail to resolve the crux of the government's disagreement with the discovery ruling in the criminal proceeding—weakening Roe's theory of malicious intent.

Roe's argument that the district court erred by declining to conduct an *in camera* review of the entire Privilege Log 1 fairs no better. It is *her* burden to provide compelling evidence of grand jury abuse to rebut the presumption of regularity that accompanies grand jury subpoenas. *Alvarado*, 840 F.3d at 189. She effectively seeks to shift the burden to the district court (or the government), requiring it to search the totality of available evidence so as to itself accumulate sufficient support for her position. We demand no such undertaking by the court below.

But even if the court erred in declining to conduct *in camera* review of all possible evidence, this error was not clear given that the district court ultimately—and reasonably—concluded that the government's *ex parte* letter foreclosed a colorable argument that abuse was the government's dominant purpose. "[W]here the [g]overnment makes a representation that an investigation is ongoing such that additional counts or additional defendants may be added, it cannot be said that the *sole or primary motivating factor* of the grand jury subpoena is to gather evidence on charges pending from an existing indictment." *United States v. Jinwright*, No. 3:09-cr-00067-W, 2010 WL 99051, at *4 (W.D.N.C. Jan. 6, 2010) (citation omitted). Here, the court concluded that, after careful

---

some discovery that it was otherwise denied by the district court in Doe's criminal proceeding, the legitimate investigative purpose renders this result permissible. *See Alvarado*, 840 F.3d at 190.

review of the government's submission, it was "satisfied . . . that [the] investigation [was] genuine and ongoing." J.A. 742. Our own review of the government's *ex parte* submission reifies our confidence that a legitimate investigative purpose underpinned the subpoenas. Thus, we cannot say with "definite and firm conviction that a mistake [was] committed" in the course of the district court's dominant-purpose analysis. *Span*, 789 F.3d at 325 (simplified). Accordingly, the court neither clearly erred in its factual analysis, nor abused its discretion by consequently denying Roe's motion to quash.

### D.

We next turn to the tangible work-product privilege. Appellants argue that the district court erred first by finding that Doe's pursuit of a consultancy agreement with UMMS began prior to his representation of Roe in the underlying malpractice case, and, second, by declining to grant work-product protections to communications pertaining to the consultancy because that agreement had a dual purpose that involved both the underlying litigation (a protected purpose) and a private business interest (an unprotected purpose). According to Appellants, the consultancy instead arose because of the Roe litigation itself, and thus materials concerning the consultancy are protected by the work-product privilege. Appellants further argue that, even if a private business purpose existed, the litigation purpose far outweighed it, and thus the materials should remain protected. The government first responds that the district court expressly assumed for the sake of argument that the documents pertaining to the consultancy were prepared in anticipation of litigation, but concluded that, despite this, they were discoverable under the crime-fraud

32

exception. The government further argues that the court correctly concluded that the documents that Appellants seek to protect did not arise because of the Roe litigation. Instead, according to the government, they were prepared because Doe sought advice, for his own benefit, related to his own pre-Roe desire to execute a consultancy.

"We review a district court's ruling on privilege for abuse of discretion, factual findings as to whether a privilege applies for clear error, and the application of legal principles *de novo*." *In re Grand Jury Subpoena*, 870 F.3d at 316 (simplified).

Under Rule 26, "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). But those materials may be discovered if "they are otherwise discoverable under Rule 26(b)(1)" and the party seeking discovery "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(i)–(ii). This Court has clarified that, to be protected, "[t]he document must be prepared *because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." *Nat'l Union*, 967 F.2d at 984. Determining the "driving force behind the preparation of each requested document is therefore required in resolving a work product immunity question." *Id.* "Materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes are not documents prepared in anticipation of litigation . . . ." *Id.* (citation omitted).

Here, the district court correctly construed the consultancy agreement and related tangible work product as not arising because of the prospect of litigation. Thus, the court properly concluded that work-product privilege does not bar production. Reviewing the court's factual determinations for clear error, it is apparent that Doe sought execution of the consultancy agreement separate and apart from the prospect of litigation in Roe's underlying case. To be sure, Doe made several comments to UMMS representatives throughout their negotiations indicating that the consultancy agreement derived from, and was an intertwined component of, the settlement of Roe's claims. *See, e.g.*, J.A. 451 (Doe effectively agreeing that the consultancy and settlement are intertwined); 560 (Doe agreeing that the consultancy and settlement "go hand-in-hand, they're in tandem. You know, we can't sort of resolve one without the other"). But these positions amount to little more than negotiation tactics at best, or extortive pressures, at worst, geared towards the realization of his ideal outcome. When testifying under oath during his ethics proceeding and his deposition, his tune changed entirely, conveying instead that his consultancy scheme existed wholly apart from the Roe case. For example, he stated that the settlement and the consultancy "always were separate and apart, and we perceived her case as a separate entity and the consultancy as a separate entity, always." J.A. 1798. He also stated that the consultancy and settlement "all along, [] were two separate things." J.A. 1883.

Appellants cannot have their cake and eat it too in this regard. Doe seemed to change positions depending on the context—when coercing UMMS to pay up, his story was that the consultancy was borne of the settlement, and thus manifested because of the prospect of litigation. But when seeking to avoid potential ethical exposure arising from

such a substantial personal stake in a painstakingly contrived outcome, he swore that the consultancy was a separate beast with absolutely no bearing on his representation of Roe. Certainly, a district court does not clearly err when relying on sworn statements over negotiation-driven puffery. So, the district court's consequent legal determination that the "driving force behind the preparation" of documents relating to the consultancy was Doe's own wholly independent business interest withstands *de novo* review. *Nat'l Union*, 967 F.2d at 984. Thus, the court properly applied *National Union*'s "because of" test, concluding that tangible work product related to the consulting agreement is discoverable.[13]

E.

Turning to the opinion work-product privilege, Appellants argue that the district court erred by finding that the crime-fraud exception renders opinion work product discoverable despite the usual privilege. First, they contend that the court below misapplied this Court's decisions in *In re Doe*, 662 F.2d 1073 (4th Cir. 1981), and *Hanson v. United States Agency for International Development*, 372 F.3d 286 (4th Cir. 2004), by concluding that alleged misconduct by Doe forfeited the privilege held by his innocent client—Roe. Second, Appellants argue the district court abused its discretion by finding the crime-fraud exception applicable to Doe based solely on the criminal indictment—and

---

[13] Notably, even if the disputed material had been prepared because of the prospect of litigation—thus warranting protection as tangible work product—the crime-fraud exception, discussed below, would still render it discoverable.

35

without regard for Doe's evidence that he lacked criminal intent. The government responds first that the district court properly applied *Doe* and *Hanson*, and second that there is no reason to believe that the district court ignored Doe's intent evidence or otherwise clearly erred by relying on the indictment when applying the crime-fraud exception.

As discussed, "we review a district court's ruling on privilege for abuse of discretion, factual findings as to whether a privilege applies for clear error, and the application of legal principles *de novo*." *In re Grand Jury Subpoena*, 870 F.3d at 316 (simplified).

Under Rule 26(b)(3)(B), a district court ordering discovery "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Notably, this Court recognizes that opinion work product "enjoys a nearly absolute immunity and can be discovered by adverse parties only in very rare and extraordinary circumstances." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 174 (4th Cir. 2019) (simplified). One such privilege-eroding circumstance is when the protected material's purpose is to further a crime or fraud. *See In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005). This is colloquially known as the crime-fraud exception.

"The party asserting the crime-fraud exception . . . must make a prima facie showing that the privileged communications fall within the exception." *Id.* (citation omitted). Specifically, the invoker must show that "(1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme, and (2) the documents containing the privileged materials bear a close relationship to the

client's existing or future scheme to commit a crime or fraud." *Id.* (citation omitted). The first prong is satisfied by an evidentiary showing that "would establish the elements of some violation that was ongoing or about to be committed." *Id.* (citations omitted). The second prong is satisfied by "a showing of a close relationship between the attorney-client communications and the possible criminal or fraudulent activity." *Id.* (citation omitted).

In the context of tangible work product, a showing that the crime-fraud exception applies does not require proof either by a preponderance of the evidence or beyond a reasonable doubt. *See id.* Instead, the proof "must be such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted." *Id.* (simplified). But because opinion work product is more strictly protected, "more than prima facie evidence" is required to overcome the privilege. *Id.* at 252 n.3 (citation omitted). However, this Court has clarified that "[p]rima facie evidence of the illegal activities of an attorney clearly suffices as an extraordinary circumstance" justifying the discovery of opinion work product. *Id.* (citation omitted). Finally, although such a showing may warrant a finding in favor of the offering party—here, the government—it does not compel such a finding. *Id.* at 251.

Appellants effectively argue that even if the crime-fraud exception would otherwise apply, the fact of Roe's innocence in any scheme allows her to claim privileges otherwise lost to Doe—thereby protecting him, too. To be sure, this Court has recognized that "an attorney may not unilaterally waive the privilege that his client enjoys. '[T]he ability to protect work product normally extends to both clients and attorneys, and the attorney or the client, expressly or by conduct, can waive or forfeit it, but only as to himself.'" *Hanson*,

372 F.3d at 294 (alteration in original) (emphasis omitted) (quoting *In re Doe*, 662 F.2d at 1079). But this Court decided *Hanson* in the context of the client itself participating as the defendant in a litigation, and there existing a potential waiver by the defendant-client's attorney. We have not yet addressed a situation in which an innocent, third-party client intervenes to assert a privilege otherwise lost to a defendant attorney. The situation here is especially unique given that the original suit implicating the innocent client's interests has concluded via settlement. In other words, Roe retains little personal stake in her privileges as they relate to her claims against UMMS because she and the hospital have settled. Thus, the continued confidentiality of Doe's theories and opinions regarding her case is no longer strictly necessary for strategic purposes.

Given the unique posture of this dispute, consideration of the policy behind work-product protections is instructive. "The work product rule recognizes the lawyer's services as an indispensable part of the judicial scheme, but it was not designed as a fringe benefit for protecting lawyers who, for their personal advantage, abuse it." *In re Doe*, 662 F.2d at 1079. To bar discovery here would frustrate this Court's policy of preventing abuse, while simultaneously doing nothing to further our interest in protecting innocent clients because Roe needs no protection—her case has settled.

As we explained in *Grand Jury Proceedings #5*, "[p]rima facie evidence of the illegal activities of an attorney clearly suffices as an extraordinary circumstance needed to discover opinion work product." 401 F.3d at 252 n.3 (citation omitted). An innocent client's willingness to go to bat for their lawyer—with little to no enduring personal stake in confidentiality—is not a compelling reason to disallow discovery. At least some of our

sister circuits agree. *See, e.g.*, *In re Impounded Cases (Law Firm)*, 879 F.2d 1211, 1213–14 (3d Cir. 1989) ("It is not apparent to us what interest is truly served by permitting an attorney to prevent this type of investigation of his own alleged criminal conduct by asserting an innocent client's privilege with respect to documents tending to show criminal activity by the lawyer. . . . [T]he values implicated, particularly the search for the truth, weigh heavily in favor of denying [] privilege in these circumstances."); *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1337 (11th Cir. 2018) (crime-fraud exception applied when attorney or firm engaged in crime or fraud but client did not); *Moody v. IRS*, 654 F.2d 795, 799–800 (D.C. Cir. 1981) (remanding for a district court to consider whether attorney's alleged misconduct outweighed client's legitimate interest in secrecy). Thus, we conclude that Roe's innocence does not bar application of the crime-fraud exception under these circumstances.

Finally, we review for clear error the district court's conclusion that sufficient evidence of fraud exists such that the exception applies. Nothing in the district court's order indicates that it ignored evidence presented by Appellants portraying Doe's lack of criminal intent. The court instead stated that it "carefully reviewed each of [the parties'] filings, their attached exhibits, and the recording of the meet and confer." J.A. 2309. Simply because Appellants disagree with the ultimate outcome does not render the district court's decision erroneous. We cannot thus conclude that the court clearly erred by relying on the criminal indictment as sufficient evidence of fraud, nor that the court abused its discretion by proceeding to apply the crime-fraud exception, rendering discoverable Doe's opinion work product.

F.

Lastly, we consider the attorney-client privilege.  Appellants argue that the district court erred by finding that Roe waived her attorney-client privilege by cooperating with Bar Counsel—pursuant to Maryland Rule 19-707(b)(1)—during Maryland's ethics investigation into Doe.  The government responds that the district court properly found that Roe's numerous voluntary disclosures of substantive discussions with Doe to Bar Counsel effectively waived any attorney-client privilege.

This Court reviews attorney-client-privilege determinations by district courts "under a two-fold standard of review." *Hawkins v. Stables*, 148 F.3d 379, 382 (4th Cir. 1998) (citation omitted).  If the district court's ruling relied on findings of fact, we review for clear error.  *Id.*  But if it relied on legal principles, we review *de novo*.  *Id.*

The attorney-client-privilege is "the oldest of the privileges for confidential communications known to the common law." *In re Search Warrant*, 942 F.3d at 172–73 (simplified).  It empowers the client, as the privilege holder, to "refuse to disclose and to prevent any other person from disclosing confidential communications between him and his attorney." *Id.* at 173 (simplified).  But the privilege "impedes the full and free discovery of truth," and so must be "narrowly construed." *Hawkins*, 148 F.3d at 383.

"Any voluntary disclosure of privileged or protected information typically waives [] attorney-client privilege." *In re Grand Jury 16-3817 (16-4)*, 740 F. App'x at 246 (citing *In re Martin Marietta Corp.*, 856 F.2d 619, 622–23 (4th Cir. 1988)); *see also Burlington Indus. v. Exxon Corp.*, 65 F.R.D. 26, 46 (D. Md. 1974) ("Once [a] party begins to disclose

40

any confidential communication for a purpose outside the scope of the privilege, the privilege is lost for all communications relating to the same matter."). The burden of establishing that the privilege applies is on its proponent. *Hawkins*, 148 F.3d at 383 (citation omitted).

Here, the district court's conclusion that Roe waived the attorney-client privilege relied on findings of fact that we review for clear error—and the court did not clearly err. First, the investigation during which Roe provided an interview implicated only Doe, and Roe was under no obligation to participate. She did so voluntarily. Second, her voluntary disclosures went to the heart of Doe's representation of her and included express discussion of the consultancy scheme. *See generally* J.A. 2318–19 (district court citing specific portions of Bar Counsel's interview memorandum that clearly demonstrate that Roe was entirely forthcoming regarding Doe's representation of her). Finally, although Appellants argue that Roe only "cooperated with Bar Counsel under the auspices of Maryland Rule 19-707(b)(1)," Opening Br. 35, that rule clearly provides that interview confidentiality extends only "until Bar Counsel files a petition for disciplinary or remedial action" in a matter, which it did here on July 13, 2020. Md. R. P. 19-707(b)(1). Thus, Roe waived any attorney-client privilege when she acquiesced to the interview by Bar Counsel, particularly in the wake of Bar Counsel's July 13 petition.

III.

Because we lack jurisdiction to consider Doe's arguments given the Supreme Court's effective narrowing of the *Perlman* doctrine, we dismiss him from this appeal. We

otherwise discern no reversible error below, and the parties must proceed to comply with the disputed subpoenas *duces tecum* in accordance with the district court's order compelling production and this opinion.

*DISMISSED IN PART AND AFFIRMED IN PART*